**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

**JAY DYKES, JR., ET AL**                              **CIVIL ACTION**

**VERSUS**                                             **NO. 08-536-RET-DLD**

**MAVERICK MOTION PICTURE
GROUP, L.L.C., ET AL**

**MAGISTRATE JUDGE'S REPORT**

This matter is before court on plaintiffs' motion for entry of default judgment, which has been referred to the undersigned for a report and recommendation. (rec. doc. 33).

**Background**

This action arises out of a dispute over money loaned by plaintiffs, Jay Dykes, Jr.(Jay Dykes) and Dykes and Dykes, L.L.C., to defendants, Maverick Motion Picture Group, L.L.C. (MMPG), Maverick Films, L.L.C. (Maverick Films), Ironstar, L.L.C. (Ironstar), Mark Morgan, Tara Pirnia, Austen Tayler, Guy Oseary, and Madonna Louise Ciccone, pursuant to various oral and written agreements for the production and development of certain motion pictures. Plaintiff Jay Dykes is the manager of Dykes & Dykes, L.L.C. Defendants MMPG, Maverick Films, and Ironstar are production companies, and their primary function is to develop and produce motion pictures for national and international distribution. Defendant Morgan is the CEO of MMPG and Maverick Films. Defendants Pirnia and Austen Tayler are the member/managers and/or agents of Ironstar.

Pursuant to various oral and written agreements, plaintiffs invested money with defendants for the production of certain motion pictures.  The agreements provided that defendants would repay plaintiffs' original investment, plus interest, by a certain date. Additionally, several of the agreements provided that plaintiffs would receive a "Co-

Producer," "Executive Producer," or "Associate Producer" credit and/or receive a percentage of the profits earned by the films.  When defendants failed to honor their obligations under the agreements, plaintiffs brought suit for damages based on breach of contract, unfair trade practices, conversion, unjust enrichment, and detrimental reliance (rec. doc. 1).

In response to plaintiffs' complaint, Oseary and Madonna filed motions to dismiss for lack of personal jurisdiction, which were dismissed without prejudice to defendants to refile after completing jurisdictional discovery (rec. docs. 21, 40, and 65). None of the other defendants have answered or otherwise responded to plaintiffs' complaint.

On December 10, 2008, plaintiffs filed affidavits of service on MMPG, Maverick Films, Ironstar, Morgan, and Pirnia (defaulting defendants) into the record and a motion for clerk's entry of default against these defendants (rec. docs. 14, 16, 17, 23, 24, and 29). The clerk of court issued an entry of default as to MMPG, Maverick Films, Ironstar, Morgan, and Pirnia on December 12, 2008 (rec. doc. 30).  On December 31, 2008, plaintiffs filed a motion for default judgment as to MMPG, Maverick Films, Morgan, Ironstar, and Pirnia.  A hearing on the motion for default judgment was held on September 2, 2009, in order for plaintiffs to prove their claim for damages against the defendants (rec. doc. 33 and 63). Based on the evidence in the record, the court now considers whether a default judgment is appropriate as to each defaulting defendant and whether there is sufficient evidentiary support for plaintiffs' claim for damages against each defaulting defendant.

**Substantive Law on Default Judgments**

A default judgment is a judgment on the merits that conclusively establishes the defendant's liability, but it does not establish the amount of damages. *TWA v. Hughes*, 449 F.2d 51, 70 (2nd Cir.1971), rev'd on other grounds, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d

577 (1973); *G.C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 34 (1st Cir.1980). After a default judgment, the plaintiff's well-pleaded factual allegations are taken as true, except regarding damages. *Id., citing, Au Bon Pan Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2nd Cir.1981); *Nishimatsu Construction Co. v. Houston National Bank,* 515 F.2d 1200, 1206 (5th Cir.1975).  Generally, in the context of a default judgment, an evidentiary hearing is required to determine the amount of unliquidated damages.

In order for a default judgment to be valid, the defaulting defendant must have been properly served, and the court must enjoy subject matter jurisdiction and personal jurisdiction over the defaulting party. See Fed. R. Civ. P. 55.  The court has subject matter jurisdiction over this matter based on diversity jurisdiction (rec. doc. 1); See 28 U.S.C. §1332.  The court can exercise personal jurisdiction over non-resident defendants through proper service of process. *Haper Macleod Solicitors v. Keaty & Keaty*, 260 F.3d 389 (5th Cir. 2001), citing *Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*, 841 F.2d 646, 649 (5th Cir. 1988).  If service of process is defective, however, the court cannot exercise personal jurisdiction over the defaulting defendant, and any judgment rendered under these conditions is void.  See Fed. R. Civ. P. 60(b)(4); *Jenkens & Gilchrist v. Grois & Co.*, 542 F.3d 114, 118 (5th Cir. 2008); *Haper Macleod Solicitors v. Keaty & Keaty*, 260 F.3d 389 (5th Cir. 2001), citing *Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*, 841 F.2d 646, 649 (5th Cir. 1988). Thus, before reaching the merits of plaintiffs' motion for default judgment, the court first examines whether the defaulting defendants were properly served with process.

## Discussion

*Service of Process*

Pursuant to Fed. R. Civ. P. 4(c), plaintiffs are responsible for serving defendants with

a summons and a copy of the complaint.[1] Plaintiffs attempted service on defendants

Ironstar and Pirnia through the use of a commercial courier, specifically Federal Express;

therefore, plaintiffs are required to obtain actual delivery of service, verified through a

"signed receipt from the addressee, or the addressee's agent, of the letter or parcel upon

delivery" and the affidavit of service must show the "address at which process was

delivered to the defendant." See La. R.S. 13:3204, 13:3205.[2]  Plaintiffs requested service

on both Ironstar, L.L.C. through its registered agent, Tara Pirnia, and on Tara Pirnia,

individually, at her address in New York City, New York (rec. docs. 23 and 24).[3]

---

[1] Rules 4(e)(1) (service on an individual) and 4(h)(1)(A) (service on a limited liability company) provide that an individual and an unincorporated association may be served by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made."  Plaintiffs' proofs of service state that defendants were served "via federal express .... pursuant to Fed. Rule Civ. P. 4(e)(1) and La. R.S. 13:3204" (rec. docs. 23 and 24).  The Louisiana long-arm statute, La. R.S. 13:3201, et seq., sets forth certain procedural requirements for serving non-resident defendants, and personal jurisdiction over non-resident defendants is dependent on strict compliance with the procedural requirements. *Moody v. Stevenson*, 980 So.2d 196 (La. App. 2nd Cir. 2008), citing *Clay v. Clay*, 389 So.2d 31 (La. 1979).  Section 3204 governs service of process and provides in pertinent part as follows:

> A. In a suit under R.S. 13:3201, a certified copy of the citation or the notice in a divorce under Civil Code Article 102 and of the petition or a certified copy of a contradictory motion, rule to show cause, or other pleading filed by the plaintiff in a summary proceeding under Code of Civil Procedure Article 2592 shall be sent by counsel for the plaintiff, or by the plaintiff if not represented by counsel, to the defendant by registered or certified mail, or actually delivered to the defendant by commercial courier, when the person to be served is located outside of this state or by an individual designated by the court in which the suit is filed, or by one authorized by the law of the place where the service is made to serve the process of any of its courts of general, limited, or small claims jurisdiction.

[2] For purposes of Section 3204, a "commercial courier" is defined as any foreign or domestic business entity having its primary purpose the delivery of letters and parcels of any type, and which: (1) [a]cquires a signed receipt from the addressee, or the addressee's agent, of the letter or parcel upon completion of delivery, and (2) [h]as no direct or indirect interest in the outcome of the matter to which the letter or parcel concerns. See La. R. S. 13:3204(D).

Section 3205 prohibits the entry of a default judgment until thirty days after the filing in the record of the affidavit of the individual who "[u]tilized the services of a commercial courier to make delivery of the process to the defendant, showing the name of the commercial courier, the date, and address at which the process was delivered to the defendant, to which shall be attached the commercial courier's confirmation of delivery." See La. R.S. 13:3205(2).  Because plaintiffs chose to use a commercial courier in effectuating service, plaintiffs must show that a copy of the citation and complaint were "actually delivered" to defendants, not just that they were mailed. See La. R.S. 13:3204(A).

[3] According to plaintiffs and the Florida Secretary of State, Ironstar, LLC is a Florida limited liability corporation with its principal place of business in Fort Lauderdale, Florida.  The Florida Secretary of State's

(continued...)

There are several problems with the service of process that was effected on Ironstar and Pirnia. One, the affidavits filed by plaintiffs' counsel do not reflect the "address at which process was delivered to the defendant," as required by La. R.S. 13:3205(2). Two, the Federal Express receipts attached to the return of summons do not reflect the address at which the process was delivered to the defendants. Three, the Federal Express receipts reflect that service was accepted by a "J. JAHOVIC," not Tara Pirnia, and plaintiffs have failed to introduce evidence proving that "J. JAHOVIC" is the "addressee's agent," as required by La. R.S. 13:3204 (rec. docs. 23 and 24). The evidence in the record does not prove that service was "actually delivered" to Ironstar, through its agent for service of process, or to Tara Pirnia, individually. Thus, the court cannot grant the motion for default judgment as to these defendants.

Service was properly executed on MMPG through its agent, National Registered Agents, Inc., and on Maverick Films[4] and Mark Morgan, through personal service on Mark Morgan(rec. docs. 14, 16, and 17). Thus, the court will consider the evidence presented on the motion for default judgment as to MMPG, Maverick Films, and Morgan.

*Damages*

Plaintiffs introduced evidence that MMPG and Maverick Films, through Morgan, requested that plaintiffs invest funds in MMPG's and Maverick Films' productions. Plaintiffs were provided with marketing materials for MMPG and Maverick Films that indicated that

---

[3](...continued)
website indicates that Ironstar's registered agent and manager is Tara Pirnia. Pirnia's registered agent address is 2370 N. Federal Highway, Suite 314, Ft. Lauderdale, FL, 33305, and her manager address is 11640 Gorham Avenue, Brentwood, CA, 90040. On November 5, 2008, however, Pirnia informed plaintiffs that her mailing address was 65 West 13th Street, 5A, New York NY 10011 (rec. doc. 33-6, Exhibit 4). Plaintiffs used this address for service on Ironstar and Pirnia.

[4] Maverick Films' registered agent for service of process is Mark Morgan.

the companies were owned and operated by Madonna and Oseary and that the projects that MMPG and Maverick Films were involved in developing had a high chance of success due to Madonna's and Oseary's weight in the movie industry.  Plaintiffs allege that they relied on these representations in entering into several written and oral agreements with MMPG and Maverick Films.  Plaintiffs allege that MMPG, Maverick Films, and Morgan failed to repay them for the principal investment amount, interest, back-end payments, and Associate Producer, Co-Producer, or Executive Producer credits as provided by the agreements, and that they are liable *in solido* for their failure to fulfill their obligations under the theories of breach of contract, unfair trade practice, unlawful conversion, unjust enrichment, and detrimental reliance.

The court next addresses the evidence offered in connection with each oral or written agreement at issue.[5]

1.      **July 24, 2004**, **Agreement** between **Jay Dykes** and **Maverick Films**:

Plaintiff Jay Dykes entered into a July 24, 2004, agreement with Maverick Films whereby Jay Dykes agreed to invest $75,000 for the production of certain films. The agreement provides that Maverick Films will repay Jay Dykes $28,750.00 for each "Participating Picture" only "upon receipt by [Maverick Films] of the corresponding installment of its producer fee for such Participating Picture..." (rec. doc. 64, Exhibit 13, A).[6]

_____

[5] Plaintiff Jay Dykes testified that Morgan created the document entitled "Investment Agreement" as a summary of all of the investments between Maverick Films and plaintiffs. See rec. doc. 64, Exhibit 13, p. 1-2. The document entitled "Investment Agreement" is not signed by any of the parties. Plaintiffs rely on this summary and, in some cases, the actual agreements to support their claim for damages against defendants. In many cases, the terms of the actual agreements are different than those in the summary, and in those cases, the terms of the signed agreements control.

[6] Pursuant to the July 24, 2004, agreement, Jay Dykes' original investment was $75,000.  The parties later agreed to transfer $25,000 of the $75,000 investment to the July 19, 2005, agreement; therefore, Jay Dykes testified that the 20% interest ran on the $50,000 investment.

Additionally, the agreement provides that Jay Dykes will receive "2.5% of all net proceeds backend participation actually received by [Maverick Films] for each Participating Picture," and one "Co-Producer" credit and two "Associate Producer" credits in films produced by Maverick Films. Id.  The July 24, 2004, agreement defines "Participating Picture," as "the next three (3) motion pictures for which [Maverick Films] commences principal photography."  Jay Dykes testified that *Material Girls* and *Twilight* were two of the three "Participating Pictures."

Jay Dykes testified and offered supporting evidence showing that he paid $75,000 to Maverick Films and that he has never received repayment of his investment, but he failed to offer evidence showing that Maverick Films received its "corresponding installment for each Participating Picture," which triggered Maverick Films' obligation to repay Jay Dykes. Thus, based on the evidence, the court cannot award Jay Dykes a judgment for repayment of his original investment.

The only evidence offered by Jay Dykes to show the value of a "Co-producer," "Executive Producer," or "Associate Producer" credit is an email from Mark Morgan to Jay Dykes.  In the email, Mark Morgan offered Jay Dykes a Co-Producer credit in the movie *The Stepfather* in an effort to allay his concerns over the fact that he had neither received a Co-Producer credit in the film *Material Girls*, as promised, nor received repayment for his substantial investments with the Maverick entities.  Mark Morgan stated in the email that Jay Dykes could sell the credit for an immediate return on his investment and suggested that "[p]eople pay 1/4 to ½ million dollars (and not to be paid back) for a credit of that type" (rec. doc. 62, Exhibit 16).  There is no evidence showing that Mark Morgan is qualified to assign a value to a Co-Producer credit or that his comments regarding the value of a Co-Producer credit are anything other than speculation.  In fact, considering the context of

Mark Morgan's statement regarding the value of the Co-Producer credit, it is clear that the higher the value of the credit, the greater the benefit for both Mark Morgan and Jay Dykes. The evidence offered by Jay Dykes is unreliable and does not assist the court in assigning a realistic value to the credits sought by plaintiff.  Although Jay Dykes is entitled to receive these credits pursuant to the terms of the agreement between the parties, the court is unable to assign a value to these credits and award a judgment for monetary damages associated with Maverick Films' failure to provide these credits.  Finally, Jay Dykes' testimony is sufficient to identify *Material Girls and Twilight* as two of the three "Participating Pictures" referenced in the agreement; therefore, Jay Dykes is entitled to a judgment for "2.5% of all net proceeds backend participation actually received by [Maverick Films] for each Participating Picture."[7]

2.      **April 26, 2005, Oral Agreement:**

Plaintiff Jay Dykes testified that there was an April 26, 2005, oral agreement between the parties.  Jay Dykes' testimony did not clearly identify the parties to the agreement, but it did establish that one of the plaintiffs agreed to invest $28,000 at a 25% interest rate with one of the Maverick entities for the production of certain films.  Pursuant to Jay Dykes' testimony, the terms of the agreement obligated one of the Maverick entities to repay the original investment, plus interest, to one of the plaintiffs.

Jay Dykes' testimony indicated that one of the plaintiffs tendered the $28,000 principal investment and that neither the investment nor interest has been repaid.  Jay Dykes' testimony failed to establish who, Jay Dykes, Jr. or Dykes and Dykes, L.L.C., made the investment, and in which entity, MMPG or Maverick Films, the money was invested;

---

[7] Plaintiff Jay Dykes testified that the third "Participating Picture" is entitled *The Stanford Prison Experiment*, and, to his knowledge, it has not been produced as of the date of the hearing on the motion for default judgment.

therefore, the court is unable to award either plaintiff a monetary judgment for repayment of the original investment, plus interest.

        3.      **July 19, 2005, Agreement** between **Jay Dykes** and **MMPG:**

Plaintiff Jay Dykes entered into a July 19, 2005, agreement with MMPG whereby Jay Dykes agreed to invest $125,000 for the production of certain films. (rec. doc. 64, Exhibit 13, B).  The agreement provides that if the principal investment is repaid after the due date of October 19, 2005, Jay Dykes is entitled to repayment of the principal, plus 20% interest, or $150,000. Additionally, the agreement provides that Jay Dykes will receive a "Co-Producer" credit on a picture to be chosen by MMPG.

Plaintiff Jay Dykes testified that he paid $125,000 to MMPG and that he has never received repayment of his investment, interest, or a Co-Producer credit.  Jay Dykes' testimony and the documentary evidence are sufficient to support an award in favor of Jay Dykes, Jr. and against MMPG for repayment of the principal investment, plus 20% interest, totaling $150,000.  The evidence offered to support the value of the Co-Producer credit is unreliable and does not assist the court in assigning a value to the credit sought by Jay Dykes. Thus, Jay Dykes is not entitled to a judgment for monetary damages associated with the failure to provide the Co-Producer credit.

        4.      **September 20, 2005, Agreement** between **Jay Dykes** and **MMPG**:

Plaintiff Jay Dykes entered into a September 20, 2005, agreement with MMPG whereby Jay Dykes agreed to invest $100,00 for the production of the film entitled *The Stanford Prison Experiment* (rec. doc. 64, Exhibit 13, C).  The agreement provides that if the principal investment is repaid after the due date of November 23, 2005, Jay Dykes is entitled to repayment of the principal, plus 25% interest, or $125,000.  Additionally, the agreement provides that Jay Dykes will receive an "Executive Producer" credit and "5% of

[MMPG's] adjusted gross profits from the [*The Stanford Prison Experiment.*] *Id.*

Plaintiff Jay Dykes testified and offered evidence to prove that he paid $100,000 to MMPG and that he has never received the benefits outlined in the agreement. Jay Dykes' testimony and the documentary evidence are sufficient to support an award in favor of Jay Dykes, Jr. and against MMPG for repayment of the principal investment, plus 25% interest, totaling $125,000.  The evidence offered to support the value of the Executive Producer credit is unreliable and does not assist the court in assigning a value to the credit sought by Jay Dykes. Thus, Jay Dykes is not entitled to a judgment for monetary damages associated with the failure to provide the Executive Producer credit.  Although Jay Dykes testified that, to his knowledge, the picture entitled *The Stanford Prison Experiment* was never produced, he is entitled to a judgment for "5% of [MMPG's] adjusted gross profits from *[The Stanford Prison Experiment]*," in the event it is produced in the future.

5.    **October 2005, Oral Agreement:**

Plaintiff Jay Dykes testified that there was an October 2005, oral agreement between the parties.  Jay Dykes' testimony did not clearly identify the parties to the agreement, but it did establish that one of the plaintiffs agreed to invest $100,000 at a 20% interest rate with one of the Maverick entities for the production of ceratin films.  Pursuant to Jay Dykes' testimony, the terms of the agreement obligated one of the Maverick entities to repay the original investment, plus interest,  in the amount of $120,000, to one of the plaintiffs.

Jay Dykes' testimony indicated that one of the plaintiffs tendered the $100,000 investment and that neither the investment nor interest has been repaid.  The testimony offered failed to establish who, Jay Dykes, Jr. or Dykes and Dykes, L.L.C., made the investment, and in which entity, MMPG or Maverick Films, the money was invested; therefore, the court is unable to award a monetary judgment for repayment of the original

investment, plus interest.

6.      **January 10, 2006, Agreement** between **Dykes and Dykes** and **MMPG**:

Plaintiff Dykes and Dykes entered into a January 10, 2006, agreement with MMPG whereby Dykes and Dykes agreed to invest $300,000 at a 15% interest rate for the production of a film entitled *The Stanford Prison Experiment*. The agreement provides that MMPG will repay the principal investment, plus interest, totaling $345,000 "no later than sixty days from the transfer of funds to [MMPG]" (rec. doc. 64, Exhibit 13, D).

Plaintiff Jay Dykes testified on behalf of Dykes and Dykes and offered evidence to prove that it paid $300,000 to MMPG by January 10, 2006, and that Dykes and Dykes has never received repayment of the principal investment or interest. The evidence is sufficient to award Dykes and Dykes, L.L.C. a judgment against MMPG for repayment of the principal investment, plus 15% interest, totaling $345,000.

7.      **September 14, 2005, Agreement** between **MMPG** and **Ironstar**:

On September 14, 2005, MMPG and Ironstar entered into an agreement whereby MMPG agreed to assume a $117,000 debt owed by Ironstar to plaintiff Jay Dykes (rec. doc. 64, Exhibit 13, F). Pursuant to the agreement, MMPG was obligated to repay the $117,000 debt directly to Jay Dykes.

Plaintiff Jay Dykes testified that he has never received repayment of this debt by MMPG. The evidence is sufficient to award Jay Dykes, Jr. a judgment against MMPG in the amount of $117,000.

8.      **October 10, 2006, Oral Agreement:**

Plaintiff Jay Dykes testified that there was an October 10, 2006, oral agreement between the parties. Jay Dykes' testimony did not clearly identify the parties to the agreement, but it did establish that one of the plaintiffs agreed to invest $65,000 at a 20%

interest rate with one of the Maverick entities for the production of certain films.  Pursuant to Jay Dykes' testimony, the terms of the agreement obligated one of the Maverick entities to repay the original investment, plus interest, to one of the plaintiffs.

Jay Dykes' testimony indicated that one of the plaintiffs tendered the $65,000 principal investment and that neither the investment nor interest has been repaid.  Jay Dykes' testimony failed to establish who, Jay Dykes, Jr. or Dykes and Dykes, L.L.C.,made the investment, and in which entity, MMPG or Maverick Films, the money was invested; therefore, the court is unable to award plaintiffs a monetary judgment for repayment of the original investment, plus interest.

9.      **January 31, 2005, Agreement**:

Plaintiff Jay Dykes testified that Maverick Films signed an agreement on January 31, 2005, in which it agreed to give Jay Dykes a "Co-Producer" credit in the film *Material Girls*. Jay Dykes testified that he never received the Co-producer credit associated with *Material Girls*.

Again, the evidence offered to support the value of the Co-Producer credit is unreliable and does not assist the court in assigning a value to the credit sought by Jay Dykes.  Thus, Jay Dykes is not entitled to a monetary judgment against Maverick Films for the failure to provide the Co-Producer credit.

In addition to damages for defendants' failure to satisfy their obligations under the agreements between the parties, plaintiffs seek reimbursement for their attorneys' fees incurred in connection with this matter (rec. doc. 62).  Pursuant to Louisiana law, attorneys' fees are not allowed except where authorized by statute or contract. *Sher v. Lafayette Ins. Co.*, 988 So.2d 186 (La. 2008), citing *Rivet v. State,* 680 So.2d 1154 (La. 1996).  Although

plaintiffs may be able to recover their attorneys' fees based on the Louisiana Unfair Trade Practices Act or a particular provision in the agreements between the parties (although the court was unable to locate an attorneys' fee provision), the evidence submitted by plaintiffs is insufficient to award attorneys' fees at this time.  Plaintiff Jay Dykes testified that he (on behalf of himself and Dykes and Dykes) has paid approximately $63,400 in attorneys' fees, and, specifically, $30,000 in attorneys' fees associated with collection of the debts owed by MMPG, Maverick Films, and Morgan. Plaintiffs failed to offer evidence, testimony or otherwise, that would support a finding that $30,000 of the attorneys' fees were associated with the collection of debts owed by MMPG, Maverick Films, and/or Morgan, as opposed to other defendants. Additionally, plaintiffs did not introduce their attorney fee bills associated with this matter, which would have allowed the court to make an independent determination of whether the fees were owed.

Plaintiffs request that Mark Morgan, MMPG, and Maverick Films be held liable *in solido* for the debts owed to plaintiffs (rec. doc. 62).  As limited liability companies, both MMPG and Maverick Films are separate legal entities, distinct from their members. See La. R.S. 12:1301(D).  Generally, no member, manager, employee, or agent of a limited liability company is liable in such capacity for a debt, obligation, or liability of the limited liability company. See La. R.S. 12:1320(B).  A member, manager, employee, or agent of a limited liability company may be held individually liable for "negligent or wrongful acts," when those acts are done outside his capacity as a member, manager, employee, or agent of the limited liability company. See La. R.S. 12:1320(D); *Roth v. Voodoo BBQ, LLC*, 964 So.2d 1095 (La. App. 4th Cir. 2007), citing *Curole v. Ochsner Clinic, L.L.C.*, 811 So.2d 92, 97 (La. App. 4th Cir. 2002).  Plaintiffs have failed to assert allegations against Morgan for actions constituting individual negligence or fraud, separate and apart from his role as

manager of MMPG and/or Maverick Films; therefore, there is no basis for finding Morgan individually liable for the debts of MMPG and/or Maverick Films.  Furthermore, plaintiffs have failed to offer legal support for a finding of solidary liability between the defendant debtors; therefore, the defendants are liable only for the debts owed pursuant to the agreements between the parties.

Finally, plaintiffs seek "accrued interest from the date of judicial demand on August 22, 2008, at the federal rate of legal interest pursuant to 28 U.S.C. §1961" (rec. doc. 62). Section 1961 provides for "interest on any money judgment in a civil case recovered in a district court," to be "calculated from the date of the entry of the judgment...". See 28 U.S.C. §1961(a). Thus, plaintiffs are entitled to post-judgment interest pursuant to 28 U.S.C. §1961.  State law governs an award for pre-judgment interest.  *Loft v. Lapidus*, 936 F.2d 633 (1st Cir. 1991).  Pursuant to Louisiana law, interest is recoverable on debts arising *ex contractu* from the time they become due, unless otherwise stipulated. *Corbello v. Iowa Production*, 850 So.2d 686 (La. 2003).  Thus, plaintiffs are entitled to pre-judgement interest on each obligation from the time payment was owed under the terms of each agreement.

**IT IS RECOMMENDED** that plaintiffs' motion for default judgment (rec. doc. 33) should be **GRANTED IN PART AND DENIED IN PART,** as follows:

(1) the motion for default judgment as to **Ironstar, L.L.C. and Tara Pirnia** should be **DENIED**, and the clerk's entry of default judgment (rec. doc. 30) should be **SET ASIDE** as to **Ironstar, L.L.C. and Tara Pirnia.**  Plaintiffs should be given **sixty (60) days** to perfect service upon defendants Ironstar, LLC and Tara Pirnia and/or to file a corrected motion for default judgment with relevant evidence and case authority for their position that service has been perfected, specifically addressing the issues raised by the court.

(2) the motion for default judgment as to **Maverick Motion Pictures Group,**

**Maverick Films, and Mark Morgan** should be **GRANTED** as follows:

- A judgment should be entered in favor of **Jay Dykes, Jr.** and against **Maverick Films** for "2.5% of all net proceeds backend participation actually received by Maverick Films" for the films *Material Girls and Twilight.*

- A judgment should be entered in favor of **Jay Dykes, Jr.** and against **Maverick Motion Picture Group** in the amount of $392,000 and for "5% of Maverick Motion Picture Group's Adjusted Gross Profits from *The Stanford Prison Experiment.*

- A judgment should be entered in favor of **Dykes and Dykes, L.L.C**, and against **Maverick Motion Picture Group** in the amount of $345,000.

- A judgment should be entered in favor of **Jay Dykes, Jr. and Dykes and Dykes, L.L.C.** for post-judgment interest from the date of entry of the judgment pursuant to 28 U.S.C. §1961, and pre-judgment interest on each obligation covered by this judgment from the time each obligation was owed under the terms of each agreement.

**IT IS FURTHER RECOMMENDED** that after all delays for filing objections and appeals have expired, plaintiffs should submit a proposed judgment in accordance with this recommendation (or any amended recommendation or order), including specific monetary calculations for pre-judgment and post-judgment interest.

Signed in Baton Rouge, Louisiana, on May 10, 2010.

_____

**MAGISTRATE JUDGE DOCIA L. DALBY**

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JAY DYKES, JR., ET AL** | **CIVIL ACTION** |
| **VERSUS** | **NO. 08-536-RET-DLD** |
| **MAVERICK MOTION PICTURE GROUP, L.L.C., ET AL** | |

### NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U.S. District Court.

In accordance with 28 U.S.C. §636(b)(1), you have 14 (fourteen) days from date of receipt of this notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report.  A failure to object will constitute a waiver of your right to attack the factual findings on appeal.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in Baton Rouge, Louisiana, on May 10, 2010.

_____

**MAGISTRATE JUDGE DOCIA L. DALBY**